IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 3, 2004

## STATE OF TENNESSEE v. FARIS ABD AL-ALI

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-51449     Lee Asbury, Judge**

---

**No. M2003-00662-CCA-R3-CD - Filed April 16, 2004**

---

A jury convicted the Defendant, Faris Abd Al-Ali, of rape of a child. The Defendant was subsequently sentenced to twenty-two years of incarceration for this offense. In this direct appeal, the Defendant contends that the trial court erred when it refused to suppress his statement, and also contends that he is entitled to a new trial because the State failed to elect upon which offense it was seeking a conviction. Finding no merit in the Defendant's contentions, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Russell N. Perkins, Murfreesboro, Tennessee, for the appellant, Faris Abd Al-Ali.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; and William C. Whitesell, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Since the victim in this case is a minor, we will identify her by her initials. The victim, N.Y., was seven years old at the time of the offense in August 2001. She and her younger sister Veronica were living with their maternal grandmother, Debra Kann, who had custody of both children. N.Y. referred to her grandmother as her mother. N.Y.'s biological mother and Ms. Kann's daughter, Lisa Lantz, lived with the Defendant and their two children, Ramsey and Tiana. N.Y. was the eldest of Ms. Lantz's four children; the Defendant was not her father.

During a family visit in which Ms. Kann, Ms. Lantz, the Defendant and all four children were together in Smyrna, Tennessee, Ms. Kann and Ms. Lantz needed to run some errands. They left at about seven o'clock in the evening, taking Ramsey and Veronica with them. The Defendant had volunteered to keep N.Y. and Tiana while they were gone. N.Y. testified that, after Ms. Kann and

Ms. Lantz left, she and Tiana went outside with the Defendant. Here, she stated, the Defendant made her smoke a cigarette. They returned into the house, and the Defendant put Tiana to bed; N.Y. was watching cartoons. N.Y. testified that, after he put Tiana to bed, the Defendant "dragged" her into the bedroom where Tiana was sleeping and placed her on the bed. There, the Defendant removed her shorts and "put his mouth on [her] private." N.Y. testified that the Defendant's tongue touched her "private part." The Defendant then removed her from that bed and "dragged" her into another room, placing her on a pallet on the floor. There, the Defendant again put his tongue on her "private part." She hit the Defendant in the head with a cup and a doll, and also tried to kick and bite him. She stated that she screamed for help. The Defendant told her "don't tell" and told her to take a bath. N.Y. testified that the Defendant spoke English to her.

Debra Kann testified that she had known the Defendant for five years and had a good relationship with him. She stated that he "seemed to be a good father." She testified that she knew no Arabic and that all of her discussions with the Defendant had been in English. She stated that she never had any trouble communicating with the Defendant, and that "his English was very good."

Ms. Kann explained that, on the night in question, she had gone to town to run some errands, including some grocery shopping. While she was in the grocery store, N.Y. called her cellphone numerous times and left a message that nothing was wrong, but she needed Ms. Kann to "hurry and come back." When Ms. Kann returned to her car and retrieved this message from her cellphone, she had her daughter, Ms. Lantz, call home on the cellphone to check on N.Y. Ms. Lantz did so and, because the speakerphone feature was activated, Ms. Kann could hear the conversation. Ms. Kann testified that she heard the Defendant on the phone and that he said that N.Y. was crying and upset and wanted Ms. Kann to come home. When Ms. Kann arrived back at the house, N.Y. tried to approach her as though to tell her something, but the Defendant told N.Y. to leave Ms. Kann alone, that Ms. Kann was tired and needed to go to bed. Ms. Kann did not speak to N.Y. about why she was upset until the next day.

The next day, Ms. Kann testified, N.Y. approached her and asked her not to be angry with her, that she had a secret to tell. Ms. Kann assured N.Y. that she would not be angry and that N.Y. did not need to keep secrets from her. Ms. Kann continued:

> And then she kept -- she said that -- first she started crying. And I could tell whatever it was, you know, was really upsetting her. And she was wringing her hands, and she couldn't find the words to really describe what was going on. And then finally she said that Faris did nasty stuff to her.
>
> And I said what do you mean, Faris did nasty stuff to you, and she said -- she started crying. And she just -- she couldn't tell me what was going on. And I asked, I said can you show me what happened, and she got one of Tiana's dolls and took it into Lisa's room and laid it on a pillow and spread the legs apart and put her mouth down in between the doll's legs and said that was what Faris did to her. And I asked

her when, and she told me that it was when that me and my daughter had left and went to Greenbrier.

After hearing this, Ms. Kann called Ms. Lantz in and N.Y. repeated her allegations to Ms. Lantz. Ms. Lantz then called the police.

The Defendant was away from the house at the time N.Y. was explaining what had happened to her. He arrived back at the house shortly before the police arrived. Ms. Kann and Ms. Lantz confronted him with what N.Y. had told them he had done. Ms. Kann testified that, "He said he didn't do it and that if we thought he would do something like that, he would kill his self first." At that point, Ms. Kann stated, N.Y. "just looked at him with tears in her eyes, looked him in the eye, and said, 'Yes, Faris, you did do that.'"

When a police officer arrived a few minutes later, Ms. Kann and Ms. Lantz left the Defendant in the house and went out on the front porch to speak with the officer. When the officer came inside to speak with the Defendant, the Defendant was nowhere to be found.

Some weeks later, the Defendant made contact with Ms. Kann and Ms. Lantz from Canada. He subsequently turned himself in to the authorities and was in custody in Detroit awaiting extradition to Tennessee. Detectives John Liehr and Jeff Peach went to Detroit to pick up the Defendant and return him to Tennessee. When Det. Liehr initially met the Defendant at the Detroit police station, he told the Defendant that they were there to transport him to Tennessee "in reference to a sealed indictment." Det. Liehr testified that all of his dealings with the Defendant were in English and that the Defendant appeared to have no problems understanding him. Nor did Det. Liehr have any problems understanding the Defendant. Det. Liehr stated that, on the way to the airport, he sat in the back seat with the Defendant and they engaged in some "idle chitchat." Det. Liehr testified that, while they were standing at the gate waiting to board the airplane, the Defendant "started getting a little upset and began to cry a little bit and started to kind of talk about what happened." Det. Liehr stated that the Defendant's words were, "If she said I did it, then I did it. If I'm guilty, then I'm guilty." Det. Liehr described this statement by the Defendant as "spontaneous." Det. Liehr told the Defendant that it was not an appropriate time to discuss it, and that they would talk about it when they got to Smyrna. They had no further discussions about the allegations.

When they arrived at the police station in Smyrna, Det. Liehr accompanied the Defendant to an interview room and went over the Defendant's rights with him, reading from an admonition and waiver of rights form. Det. Liehr testified, "When I finished reading all the rights to him, I explained to him that if he didn't want to talk with me and get his side of the story, that he didn't have to do that. And he stated that no, he wanted to tell me what happened and get his side of the story to me." The Defendant then signed, in English, his name to the waiver of rights form.

Det. Liehr proceeded to interview the Defendant about what had happened with N.Y. After the Defendant finished his explanation, Det. Liehr asked him to write his statement down. The Defendant told him that he could not do so because he did not write very well. Det. Liehr then asked

the Defendant to repeat his explanation and, as he did so, Det. Liehr wrote the Defendant's statement down. Because the end result was somewhat messy, Det. Liehr wrote the statement down a second time. He then read this statement back to the Defendant and asked the Defendant to sign it. The Defendant did so at the top of the page. The signed statement, with misspellings, reads as follows:

> Last part of Aug. 2001 you were babysitting [N.Y.] and Tiana. You had been drinking with friends during the day. Lisa, your girlfriend and Debbie had left to go shopping and had taken Rams[ey] and [Veronica]. This was around dark time, dusk. [N.Y.] asked you why did Lisa not take me shopping. You tr[i]ed to call Lisa several times, then [N.Y.] tr[i]ed once.

> Later you, [N.Y.] and Tiana went to the back bedroom and watched TV. You began playing and kissing [N.Y.]. You began "Fart" kissing her on her stomach. She was wearing a mid driff shirt. As you were playing she stated "Daddy you kissed me to far down" "Daddy you went to far." Then she said "Too far down." You then got up and went out to sit on the car. You had been drinking and not sure what happened. [N.Y.] and you sat in the car and talked to his neighbor.

> The next morning you went to Kentucky to check the Lotto numbers. When you returned home Lisa confronted you about sexually abusing [N.Y.]. Debbie then called the Police. When the Police arrived you left out the back door. You went for a walk, because you had stuff in your head. You then got a ride to Nashville.

> After staying in Nashville for around a week you gave Hommed the title to the car, birth certificate and social security cards and had him give this to Lisa. You then talked to a guy that was going to Detroit Mich. After you were in Detroit for a few days you went to Canada, London Ontario, for around a month. You tr[i]ed to call Lisa several times. You then turned yourself in to the Police.

Det. Liehr testified that he took the Defendant before the magistrate after the Defendant gave this statement, and the Defendant interacted with the magistrate in English. On cross-examination, Det. Liehr admitted that he had never asked the Defendant if he had a problem understanding English.

The Defendant put on only one witness, Lisa Lantz. Ms. Lantz testified that N.Y. felt some animosity toward the Defendant because she felt that he did not want her around. She had noticed no unusual problems between the Defendant and her four children prior to the instant occasion, however. On cross-examination, Ms. Lantz testified that the Defendant spoke to the children in English, and that he had had no trouble finding jobs because of language difficulties.

## MOTION TO SUPPRESS

Prior to trial, the Defendant filed a motion to suppress his statements to the police on the grounds that his waiver of his constitutional rights was "not knowingly and intelligently made." A

hearing was held, during which Detectives Liehr and Peach and the Defendant testified. The State's proof was consistent with that which was later offered at trial. The Defendant testified through an interpreter that he was an Iraqi citizen living in the United States as a refugee. The Defendant stated that he had a "green card" and had been living in the United States for approximately eight years. He explained that he had not applied for citizenship because his English was not adequate to pass the test. The Defendant stated that he can speak "some" English, but had no experience with legal terminology. He explained that, while he was in the Detroit jail, an interpreter was provided to him.

The Defendant admitted to having signed the waiver of rights form, but stated that he did so because the detective asked him to. He testified that he did not remember the detective going over the form with him. He also explained that he could not read or write English, and thought he was signing something in relation to his medical records. As to the statement that he signed, he stated that there were only three or four lines of writing on the sheet of paper at the time he signed it. He wanted to sign the sheet of paper at the bottom, but the detective told him to sign it at the top. At the time he signed it, the statement stopped with the sentence, "This was around dark time, dusk." The Defendant testified that the rest of the statement was written in after he had signed it; he flatly denied that Det. Liehr read the statement to him to verify its accuracy. With respect to whether he understood what he was signing, the Defendant said, "Of course not. I wouldn't have signed it if I knew." He also maintained that he did not understand his rights when he signed the waiver and did not understand that, by signing the waiver, he was giving up any rights.

On cross-examination, the Defendant admitted to having lived in both Florida and Tennessee since he emigrated to the United States. He held jobs in both states. He obtained driver's licenses in both states, without the benefit of an interpreter. He stated that, during the interview in the Smyrna police department, he requested an interpreter. He made this request before signing the advice and waiver of rights form. Det. Liehr told him, "don't worry, I'll help you. But sign this document."

At the conclusion of the hearing, the trial court denied the Defendant's motion to suppress. In its written order, the trial court found that the Defendant had been in the United States since 1991; obtained two valid driver's licenses from two different states; and "never ask[ed] for an interpreter to help him understand what was going on." Based on these findings, the trial court denied the Defendant's motion to suppress.

In our review of motions to suppress,

[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We must uphold the trial court's findings of fact unless the evidence preponderates otherwise. See id. This Court may look to the evidence adduced at both the suppression hearing and during the trial in reviewing the trial court's ruling. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

We conclude that the evidence does not preponderate against the trial court's findings. In addition to the facts referred to in the trial court's order, Ms. Kann testified that she spoke to the Defendant in English, not knowing any Arabic herself, and that the Defendant's English was "very good." Det. Liehr testified that he had no trouble understanding the Defendant and the Defendant appeared to have no trouble understanding him. The trial court clearly credited Det. Liehr's credibility over that of the Defendant. The evidence does not preponderate against the trial court's determination that the Defendant waived his Miranda rights knowingly and intelligently. Defendant is not entitled to relief on this issue.

## ELECTION OF OFFENSES

Defense counsel raised the election issue with the trial court during the Defendant's trial. The trial court ruled that the State had proven only one offense and therefore was not required to make an election. N.Y. testified at trial that Defendant placed her on the bed in one room and placed his mouth on her "private part," then moved her to a pallet on the floor in another room and repeated this action. The Defendant contends that, by eliciting this testimony, the State proved two discrete instances of rape of a child, and was therefore required to elect the offense for which it was seeking a verdict. See generally State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) ("when the evidence indicates [that] the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought.") The State responds that the Defendant's conduct constituted one continuous offense and that no election was therefore required.

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

N.Y. testified that the Defendant dragged her into the bedroom in which Tiana was sleeping and put her on the bed next to Tiana. He then put his mouth on her genitals. N.Y testified that the Defendant then moved her from that room to another room "because he didn't want Tiana waking up." In this second room, the Defendant placed N.Y. on a pallet on the floor and again put his mouth on her genitals. N.Y. did not state how much time passed between these two episodes, but her testimony makes clear that the second incident followed very closely the first.

As our supreme court has observed, "[t]he paramount importance of the election requirement is that it protects a defendant's right to a unanimous jury verdict under the Tennessee Constitution by ensuring that jurors deliberate over and render a verdict based on the same offense." State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001). Thus, in order to determine whether an election was required in this case, we must determine whether the Defendant's conduct constituted a single, continuing offense against N.Y., or whether it constituted two separate offenses.

In cases involving sexual offenses, several factors are relevant to making this determination, including the nature of the acts, the area of the victim's body invaded by the sexually assaultive behavior, the time elapsed between the discrete conduct, and the accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse. See State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). In this case, the nature of the acts was identical: the Defendant placed his mouth on the victim's genital area. Therefore, the area of the victim's body that was invaded was the same in both instances. From the testimony, we are confident in concluding that the elapsed time between the episodes was minimal. The remaining issue is whether the Defendant's intent during these two assaults was continuous, or whether it was terminated and then renewed.

As previously noted by this Court, "[t]he issue of multiplicity in cases involving sexual offenses is often difficult to resolve." State v. Reginol L. Waters, No. M2001-02682-CCA-R3-CD, 2003 WL 213777, at *11 (Tenn. Crim. App., Nashville, Jan. 30, 2003). Previous decisions offer us guidance, however. For instance, in State v. Michael D. Evans, No. 03C01-9703-CR-00104, 1997 WL 772910 (Tenn. Crim. App., Knoxville, Dec. 9, 1997), aff'd 108 S.W.3d 231 (Tenn. 2003), this Court considered proof that established that the defendant was having vaginal intercourse with the victim while she was on her back. The defendant ceased the intercourse and changed positions, resuming with the defendant on his back and the victim on top of him. This Court held that,

> Clearly, the sexual assaults invaded the same body areas of the victim, were of the same nature, and only seconds elapsed between the two penetrations. We are unable to conclude that these intervening seconds provided sufficient lapse of time so as to permit the development of "a newly formed intent." Accordingly, we find that the two vaginal penetrations of [the victim] were not separate and distinct offenses.

Id. at *4 (citation omitted).

In State v. Adrian Arnett, No. 03C01-9811-CR-00395, 2000 WL 122222 (Tenn. Crim. App., Knoxville, Feb. 2, 2000), aff'd 49 S.W.3d 250 (Tenn. 2001), the defendant was convicted of two counts of aggravated rape. The victim had testified that the defendant "tried to put his penis inside of me, but he couldn't get it in. So he used his finger, and then he tried again and put his penis inside of me then." Id. at *7. This Court held that this proof supported only a single conviction of aggravated rape, not two convictions, stating:

> Clearly, the penetrations invaded the same body area of the victim, with only seconds elapsing between the two penetrations. Obviously, from the victim's testimony, the

digital penetration was merely the means of completing the penile penetration. We are unable to conclude that the intervening seconds between the penetrations provided a sufficient lapse of time so as to permit the development of "a newly formed intent" as the digital penetration only served to facilitate the penile penetration.

Id.

Cases involving different forms of penetration have been found to support a finding of multiple offenses. For instance, in State v. Kendrick, supra, the defendant was convicted of a single count of aggravated rape. However, the proof demonstrated that the defendant forced the victim to perform fellatio on him and then forced her to engage in vaginal intercourse five to ten minutes later. See 38 S.W.3d at 569. Our supreme court held that these two acts of sexual penetration were separate and distinct offenses. See id. In Phillips, supra, the defendant vaginally penetrated the victim with an object, performed cunnilingus upon her, and forced her to engage in vaginal intercourse, all over a three-hour period. See 924 S.W.2d at 664. Our supreme court held that this proof supported three separate convictions on the basis that the defendant's actions involved different positions and different body parts. See id. at 665. The court noted that, given the three-hour time span and "natural limitations on human sexual endurance," the defendant's conduct should not be characterized as a single, continuous event. See id.

Perhaps most similar to the case before us is State v. Reginol L. Waters, supra. There, the defendant broke into the victim's home and forced her to perform fellatio on him while they were in the bathroom. The victim bit the defendant and escaped from the bathroom. She had managed to unlock one of the locks on her apartment door when the defendant caught her and pulled her away. The defendant choked and hit the victim and they struggled with the knife the defendant had. The victim made another failed escape attempt, after which the defendant forced the victim to perform another act of fellatio. The victim testified that the two episodes occurred about five minutes apart. This Court held that the defendant's actions constituted two separate rapes. See id. at *12.

In Waters, as in our case, the two acts of penetration were of the same nature and involved the same area of the victim's body. Only a short period of time elapsed between the two attacks. However, the interruption in the defendant's assault upon the victim in the Waters case was far more significant than the one which occurred in the instant case. In Waters, the victim was able to successfully stop the defendant's attack by biting him. She was then able to escape from him and ran from the bathroom. Before the defendant was able to sexually penetrate her again, he had to engage in mutual combat that lasted several minutes. During this struggle, the defendant's primary intent was to subdue the victim, because only then could he sexually penetrate her a second time. Thus, the lapse of time and the events that occurred during that lapse of time indicated "a newly formed intent to again seek sexual gratification or inflict abuse" by the time of the second penetration. See id. at *13.

In the instant case, there was no forcible interruption in the Defendant's attack upon N.Y. The Defendant moved the victim so as not to wake her baby sister. That is, he moved N.Y. for his convenience and to facilitate his being able to continue his assault without distraction. There appears to have been no appreciable lapse of time between the two episodes. Moreover, we are confident in concluding that the Defendant's intent was continuous, rather than thwarted and formed anew. N.Y. testified that the Defendant moved her in order to avoid waking Tiana. The movement was voluntary on the Defendant's part and occasioned by his own decision rather than any external interruption of his behavior. The Defendant's behavior in the second room was identical to his behavior in the first. In short, we consider the Defendant's choice to move N.Y. to constitute a "pause" in his assault rather than a termination followed by a new attack. Accordingly, we conclude that the State was not required to make an election of offenses, and the trial court made no error in this regard. Defendant is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE